# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:16-cr-00267-CCB** |
| | : | |
| **SYDNI FRAZIER,** | : | |
| | : | |
| **Defendant** | : | |

## DEFENDANT'S REPLY IN SUPPORT OF
## MOTION TO SUPPRESS EVIDENCE SEIZED FROM 961 BENNETT PLACE

On November 16, 2017, a team of Baltimore Police Department officers broke down the locked front door of 961 Bennett Place, and searched that home without a warrant. Rather than argue that this intrusion was permissible under the Fourth Amendment, the Government contends that Sydni Frazier lacks standing to contest this entry because he did not have a legitimate, reasonable expectation of privacy in the home. This argument misconstrues the facts and relevant law.

**I.      Mr. Frazier had a reasonable expectation of privacy in 961 Bennett Place based on his renovation of the home at the owner's request.**

It is undisputed that at the time the police entered and searched the home at 961 Bennett Place, Karim Faruq was named on the deed as the owner of that property. Faruq had previously lived at that home with Mr. Frazier and Mr. Frazier's mother, Lisa Bess. Bess will testify at the motions hearing that she planned to redevelop the house for use as an assisted living facility. She will further testify that in 2017 she had Faruq's permission to use and renovate the house, that she had power of attorney for matters related to the house, and, crucially, that Mr. Frazier was carrying out renovations to the house at her behest prior to his arrest.

There is documentary support for Bess's claim of interest in the home. First, on September 27, 2017 (less than two months before the warrantless entry), Bess and Faruq filed a

letter with the Baltimore City Circuit Court asking for an extension of time in which to pay back

taxes on the property. *See* Correspondence from Bess and Faruq, attached hereto as Exhibit A.

Notably, in the letter Bess said that she has "had this property for 25 years" and "have invested

in the property." Ex. A at 1. Second, during the relevant period, the Housing Authority of

Baltimore City continued to send notices of housing code violations at 961 Bennett Place to

Karim Enterprises (a venture connected to Faruq). For example, in March 2016 the City sent

Karim Enterprises a citation for failing to file an annual registration of a vacant structure. In fact,

the Housing Authority sent a code violation to Karim Enterprises as recently as December 2019.

*See* Exhibit 12 to Government's Opposition to the Defendant's Motion to Suppress Evidence

Seized From 961 Bennett Place, p. 16-20.

The observations of the SWAT officers who entered the home on November 16 confirm

that it was secured against intruders and that renovations were underway. Footage from the

body-worn digital cameras of the officers who conducted the search makes clear that they were

entering a building with new windows and a front door with a functioning lock. Once inside the

home, the officers saw building supplies such as concrete mix, tiles, and rolls of insulation. One

of the officers stated the obvious when he said, "Looks like there's no walls—it's under

construction."

Bess and Faruq's authorization for Mr. Frazier to renovate the home, and especially their

giving him a key to the functioning lock on the front door, distinguishes Mr. Frazier's

circumstances from those in the cases the Government cites concerning what constitutes a

reasonable expectation of privacy. Mr. Frazier does not resemble, for example, the bootlegger in

*Chicco v. United States*, 284 F. 434 (4th Cir. 1922), who stored contraband liquor on the

property of another and "disclaimed any connection with or relationship to the premises from

which [the incriminating evidence] w[as] obtained." *Id*. at 436. Mr. Frazier asserts emphatically his connection to these premises.

Mr. Frazier's deep connection to 961 Bennett Place likewise distinguishes him from the defendants who were using properties in which they had no proprietary interest solely for illicit purposes. Here, there is evidence supporting the fact that the property at issue was Mr. Frazier's childhood home, that up to the time of his arrest, Mr. Frazier continued to sometimes stay there overnight[1], and that Mr. Frazier was renovating the house for use as an assisted care facility on behalf of the owners. Notably, the cases the Government cites where courts found no reasonable expectation of privacy involve fact patterns where defendants were using the property of another *solely* as a place to commit crimes. *See, e.g., United States v. Gray*, 491 F.3d 138, 154 (4th Cir. 2007) ("Askew's purpose at 4511 Altizer Avenue was patently commercial"); *Minnesota v. Carter*, 525 U.S. 83, 90, (1998) (defendants were using another person's apartment "simply [as] a place to do business); *United States v. Gamez–Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) ("[a]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location"). While there may be evidence suggesting that drugs were used or distributed at the house, evidence of illicit activity does not vitiate a person's reasonable expectation of privacy in a property they have used as a home. (Indeed, it is commonly the discovery of evidence of illicit activity that prompts an individual's assertion of his Fourth Amendment rights. *See United States v. Rock*, No. 10-CR-247, 2011 WL 2945801, *3

---

[1] The fact that Mr. Frazier *sometimes* stayed at the home of his girlfriend and her mother in Catonsville does not prove that he *never* stayed at 961 Bennett Place. Indeed, the facts that the Government points to in order to support its allegation that Mr. Frazier was using 961 Bennett Place as a location from which to sell drugs, in particular, the allegation that Mr. Frazier incorporated the street address into his email address (lilsid961@gmail.com), point to Mr. Frazier's close association with that home.

(E.D. Wisc. May 26, 2011)). Here, while the evidence may show that Mr. Frazier had illicit

purposes in occupying 961 Bennett Place, actually relevant to the instant motion is that the

evidence clearly demonstrates that this was the home in which he had grown up, which his

mother continued to control, and which he still occupied for the purposes of conducting

renovations to the property and as an occasional overnight guest. These circumstances make Mr.

Frazier's subjective expectation of privacy objectively reasonable, whereas the expectations of

the defendants from the cases the Government cites were not.

**II.      Mr. Frazier did not voluntarily abandon 961 Bennett Place.**

The Government argues that Mr. Frazier voluntarily relinquished any expectation of

privacy in 961 Bennett Place when he did not return to the home while he was incarcerated. The

argument fails because Mr. Frazier's absence was not voluntary.

Almost all search and seizure cases where the abandonment exception to the warrant

requirement arises concern relatively small things like backpacks, which a suspect might throw

while running from the police. "The privacy interest in a dwelling is not so easily extinguished."

*United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). As such, "[b]efore the government

may cross the threshold of a home without a warrant, there must be clear, unequivocal

and unmistakable evidence that the property has been abandoned. Only then will such a search

be permitted." *United States v. Harrison*, 689 F.3d 301, 309 (3d Cir. 2012)

The primary case on which the Government relies for this point is *United States v.*

*Stevenson*, 396 F.3d 538 (4th Cir. 2005). There, the police arrested Stevenson on January 20. The

next day, Stevenson wrote his ex-girlfriend and expressly transferred to her ownership of all

property he had left behind in her apartment. In the letter he also described himself as "the

former renter" of the apartment. *Id*. at 541. Three days thereafter, police searched the apartment.

The Fourth Circuit affirmed the district court's denial of the motion to suppress, finding that Stevenson's voluntary and express disclaimer of any interest in the apartment or its contents made his expectation of privacy in the apartment unreasonable. Mr. Frazier took no such steps vis-à-vis 961 Bennett Place and any property he might have stored therein. His arrest and incarceration were not voluntary. As such, his involuntary "abandonment" of the home cannot be considered "clear, unequivocal, and unmistakable."

### III.    The Baltimore Police did not have a reasonable belief that they were entering an abandoned home when the breached the door at 961 Bennett Place.

Mr. Frazier has established—as evidenced by his mother's possessory interest in the home, the intact doors and windows that kept intruders out of the home, the key he had that allowed him to come and go from the home as he pleased, and his efforts to renovate the house and store renovation materials in the home—that he had a reasonable expectation of privacy in 961 Bennett Place. These facts also demonstrate that 961 Bennett Place was not abandoned. The Government can still prevail, however, if the Government can show that the officers reasonably believed that the house was abandoned. *See Harrison*, 689 F.3d at 309. But in the circumstances present here, such a belief would not have been reasonable.

The facts that establish the reasonableness of Mr. Frazier's expectation of privacy in 961 Bennett Place all mitigate against the reasonableness of the officers' belief that the property was abandoned. Of particular import is the fact that the doors to the house were secured with functional locks and the windows were intact and backed by plywood. *Contra McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) (officers reasonably believed building was abandoned where house was in state of disrepair and back door was open allowing officers to see inside and observe signs that building was deserted). Additionally, the decrepitude of a home by itself does

not support a reasonable belief that the home was abandoned. In a similar context, the Third

Circuit noted:

> It is unreasonable to assume that a poorly maintained home is an abandoned
> home. A one-time look at 2114 North Franklin Street in its dilapidated condition
> would not justify the police entering it without a warrant because a reasonably
> cautious officer would only assume that the person who occupied the home did
> not maintain it as they should, not that they had clearly manifested an intent to
> relinquish their expectation of privacy in the house. There simply is no
> "trashy house exception" to the warrant requirement.

*Harrison*, 689 F.3d at 311.

Finally, the Housing Authority's determination that this was an abandoned property, and

the efforts by that agency to take possession of the property that the Government chronicles in its

brief, are immaterial unless this history was known to the officers at the time they entered the

building. In this way, the facts here distinguish this case from *Harrison*, in which the Third

Circuit permitted the search in large part because the officer entering the building had been in it

before and knew the inside to be as dilapidated as the outside.

The most similar case to the facts at issue here is *United States v. Spence*, No. CR 16-

20622, 2017 WL 877339 (E.D. Mich. Mar. 6, 2017). In *Spence*, Detroit police chased a man with

a gun into a house, arrested him, brought him out of the house, then reentered the house to search

for the gun. The house was in deplorable condition: there was no rear door; the lot was

overgrown and littered with garbage; the electric meter was missing and the house was without

electricity; there were several holes in the ceiling; a refrigerator was taped shut "with what

sounded like a rat inside"; and the toilet and bathtub were full of apparent urine and feces.

Notwithstanding the property's condition, the district court granted the defendant's motion to

suppress contraband the police recovered during their second foray into the house. The court

found unreasonable the officers' belief that the house was abandoned. *Id.* at *8. The court noted

the officers had no prior knowledge of the property; did not review readily available ownership records; and the house was secured by intact, closed windows and closed doors with bars. *Id.*

Similarly instructive is *State v. Brown*, 83 A.3d 45 (N.J. 2014), where the New Jersey Supreme Court affirmed a lower court's suppression of contraband seized from a house law enforcement believed was abandoned. In *Brown*, state troopers began surveillance after two confidential informants and a concerned citizen reported that an abandoned house in Camden was being used for drug sales. The troopers later testified they believed the house was abandoned based on the reports from the three citizens, as well as the ramshackle condition of the house. Specifically, they observed the electric meter was missing, one of the two front windows on the house was broken, the front door was padlocked, and the rear door was off its hinges and propped closed. Through the broken window troopers could see the living room was in "disarray" and unlit, and trash was strewn in the living room. Over two days of surveillance, troopers repeatedly observed the same behavior: a buyer gave money to one of the men in front of the house, one of the men unlocked a padlock on the house, went in briefly, then come out and handed a small object consistent with drugs to the buyer. Troopers then moved in and arrested several of the men in front of the house. A trooper took keys from one of the men and used them to open the padlock on the door to the house.

The New Jersey Supreme Court held the troopers did not have an objectively reasonable basis to believe the building was abandoned. The court pointed out that one reason not to assume a decrepit house is an abandoned house is that "[t]here are impoverished citizens who live in squalor and dilapidated housing, with interiors in disarray and in deplorable conditions, and yet these residences are their homes." *Id.* at 60. The court noted "the boarding of windows and bolting of doors" was consistent with an intent to keep people out, and therefore undercut the

conclusion that the building was abandoned. *Id*. Also important to the court was the fact that law enforcement made no effort to learn who owned the house, a fact readily ascertainable from public records. *Id*. at 63.

Together, *Spence* and *Brown* illustrate the unreasonableness of the officers' assumption here that the house they were breaking into was abandoned. In those cases, as well as the case at bar, the houses were decrepit, but also secured against intrusion. In all three cases the officers lacked personal knowledge of whether anyone was living inside, and made no effort to find out through city, tax, or utility records whether the house was in fact abandoned. In all three cases the officers entered someone's home without a warrant. In all three cases the officers violated the Fourth Amendment.

For the reasons set forth in this Reply and the original Motion, Mr. Frazier respectfully moves this Court to suppress all evidence recovered as a result of the warrantless search of his long-time home, 961 Bennett Place.

Respectfully submitted,

_____/S/_____
Adam D. Harris
Bar No. 20246
Law Office of Adam D. Harris, L.L.C.
600 Jefferson Plaza, Suite 201
Rockville, MD 20852
(301) 960-5005
adam@adamharrislawfirm.com

_____/S/_____

Christopher M. Davis
Bar No. 23441
Davis & Davis
1350 Connecticut Ave., NW
Suite 202
Washington, DC 20036
(202) 234-7300
cmdavisdc@gmail.com

Attorneys for Sydni Frazier

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 12, 2020, I served a copy of the foregoing Defendant's Reply To Government's Opposition To Motion To Suppress Evidence Seized From 961 Bennett Place on Assistant United States Attorney Christina Hoffman at the United States Attorney's Office for the District of Maryland via ECF.

_____/S/_____

Adam D. Harris