-1-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. CCB-16-0267** |
| | ) | |
| SYDNI FRAZIER, | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |
| Defendant. | ) | |

_____

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM 961 BENNETT PLACE

The Defendant, Sydni Frazier, has moved to suppress evidence seized from a vacant home at 961 Bennett Place in Baltimore, Maryland on November 16, 2017. ECF 1265. This motion should be denied. Frazier had no ownership or legitimate possessory interest in 961 Bennett Place, a vacant dwelling that was in tax foreclosure proceedings and had been sold by the city to a third party in May 2016—18 months before the search took place. Even if he had permission to enter from the owner, a wealth of evidence establishes that Frazier lived elsewhere and used the vacant dwelling solely as a stash location for guns, drugs, and other contraband. Furthermore, during the roughly ten months between his arrest and the search of the building, Frazier made no effort to claim any belongings that remained and evinced no intention to return there. For all these reasons, he did not have a reasonable expectation of privacy in the vacant dwelling.

The Government reserves the right to make non-standing arguments should the Court determine that Frazier has met his burden of demonstrating a reasonable expectation of privacy in 961 Bennett Place.

-2-

## I. RELEVANT FACTUAL BACKGROUND

### A. Murder of Ricardo Johnson

On August 10, 2016, at roughly 6:25 a.m., the body of Ricardo Johnson was discovered in the backseat of a stolen van parked beside the light rail tracks in the 2200 block of Kloman Street in Baltimore.  Johnson's wrists and ankles had been bound, and he had been shot over twenty times in the head, neck, torso, and buttocks.  Numerous 9mm caliber casings and projectiles were recovered from in and around the van.  The investigation revealed that Johnson had been abducted outside his residence at 1101 West Lanvale Street at roughly 2:30 a.m. that morning while he was on the phone with his girlfriend.  Johnson's girlfriend heard what sounded like a scuffle and impassioned voices, and then the phone abruptly hung up.  She immediately called 911 and ran to the scene, but neither she nor police could locate Johnson.

At roughly 5:17 p.m. on August 10, less than twelve hours after Johnson's body had been found, members of the Baltimore Police Department ("BPD") Dirt Bike Task Force were in the area of 2100 Tucker Lane when they observed an unknown black male—later identified as Sydni Frazier—riding a dirt bike.  Because the use of dirt bikes is illegal in Baltimore City, the officers attempted to stop Frazier and confiscate the bike.  Frazier fled on foot and, in the process, abandoned the dirt bike as well as a backpack and gloves he had been wearing.  Frazier was able to evade arrest, but the officers obtained video footage of Frazier on the dirt bike from nearby surveillance cameras.

The backpack Frazier abandoned was found to contain a jacket, two cell phones, and two loaded 9mm caliber handguns—a Smith & Wesson 9mm caliber semi-automatic handgun with serial number HAE0456 and a Taurus 9mm caliber semi-automatic handgun with serial number

TJN73204.  Both guns were a ballistic match to the 9mm caliber casings recovered from the murder scene.  In addition, the BPD DNA and Serology laboratory determined that Frazier's DNA profile matched DNA from the *insides* of the gloves, and the *victim's* DNA profile matched DNA from the *outsides* of the gloves.

The cell phones found in the backpack contained additional evidence linking Frazier to the murder.  For instance, five days before the murder, on August 5, 2016, Frazier received text messages from phone number (410) 831-5525 instructing him to "Get a box of rubber gloves" because "We don't want to touch nuffn."  Exhibit 1 (Cell Phone Excerpts), at 11.  Frazier replied, "that's a mandatory."  *Id.*  On August 10, 2016, at 11:18 a.m.—roughly five hours after Johnson's body was discovered—the same phone number sent Frazier another text message attaching a screenshot of a news article about the murder, titled, "Search for witnesses after man found fatally shot in back of minivan by light rail station."  *Id.* at 13.  (At the time, police had not yet identified the victim as Ricardo Johnson.)

As discussed further below, in addition to the text messages tying Frazier to the murder, the cell phones contained text messages demonstrating that Frazier was in the business of distributing heroin.  Witness testimony has established that Frazier's involvement in drug trafficking related to his motive for committing the murder.  At Frazier's initial trial in Spring 2019,[1] ▆▆▆ testified that Ricardo Johnson was "known to have a lot of drugs," and Frazier "wanted the drugs."  According to ▆▆ , Frazier was affiliated with a Bloods gang known as

---

[1]     The Defendant went to trial with five co-defendants on March 18, 2019.  In the fifth week of trial, the Defendant's court-appointed attorney, Christopher Davis, had a medical emergency that made it impossible for him to continue in the case.  The Court declared a mistrial as to the Defendant due to manifest necessity, severed the Defendant from the case, and scheduled a retrial for February 24, 2020.  *See* ECF 1130.

-4-

Murdaland Mafia Piru (MMP), and, in the days leading up to the murder, Frazier told other members of the gang that he wanted to "kidnap" Johnson and rob him of his drug stash.  In the days following the murder, ███ heard Frazier admit to killing Johnson, and he also observed Frazier with an unusually large quantity of heroin, which Frazier shared with other members of MMP.

Robbery was not the only motive for the murder, however.  ███████ testified that the leader of MMP had authorized Johnson's murder because Johnson was rumored to be cooperating with law enforcement.  Wiretap evidence introduced at trial confirmed that members of MMP wanted Johnson dead in the weeks leading up to his murder.  In summary, the evidence established that Frazier had two motives for killing Johnson: to rob him of his drug stash, and to eliminate a potential witness against the gang.

**B.  Arrest of Sydni Frazier on January 25, 2017**

On January 25, 2017, in connection with the Ricardo Johnson murder investigation, members of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") executed a federal arrest warrant charging Frazier with possession of firearms and ammunition by a felon.  At the time of his arrest, Frazier was residing with his girlfriend (Ariel Johnson) and their 9-month-old daughter at 7002 Upper Mills Circle in Catonsville, Maryland.  At approximately 9:30 a.m., Special Agent Timothy Moore observed Frazier and Ms. Johnson exit the residence and approach a Honda Accord parked outside while carrying an empty baby car seat.  ATF agents approached Frazier and placed him under arrest.  Agent Moore delivered *Miranda* warnings, which Frazier verbally acknowledged and waived.

In a search of Frazier's person, ATF agents recovered a clear plastic bag containing a mixture of heroin and fentanyl weighing approximately five grams, three cell phones, and a set of house keys for 7002 Upper Mills Circle. The keys were returned to Ms. Johnson at her request. Frazier advised Agent Moore that he stayed at 7002 Upper Mills Circle. *Id.* at 3. Ms. Johnson confirmed that she was Frazier's girlfriend and that he stayed with her at the residence on a regular basis. She added that he kept his clothing there. Agent Moore also spoke to Ms. Johnson's mother, Ms. Tina Halloway, who arrived at the residence shortly after Frazier was arrested. Ms. Halloway advised that she was the owner of the property. She confirmed that Frazier stayed at the house with his girlfriend—her daughter, Ariel Johnson. She also asked how she could get Frazier "put out" of the house because she no longer wanted him living there.

Investigators executed a search warrant at 7002 Upper Mills Circle following Frazier's arrest. In the front bedroom on the main floor, they located photographs of Ms. Johnson and mail addressed to her. They also located clothing in a men's size small, consistent with Frazier living there.

After his arrest, Frazier was brought to the ATF building in Baltimore, where he signed a *Miranda* waiver form and agreed to take part in a videotaped interview. During the interview, Frazier made a series of demonstrably false statements. For instance, when asked about the dirt bike chase on August 10, 2016, Frazier claimed that the person on the bike was not him, and that he never rode dirt bikes or wore gloves. But publicly accessible Facebook and Instagram photographs show Frazier sitting atop dirt bikes, while wearing gloves. In addition, when shown a photograph of the victim, Frazier denied knowing him. However, wiretap evidence demonstrates that Frazier did know Ricardo Johnson, and, in fact, that Johnson owed Frazier money shortly

-6-

before the murder.   Finally, Frazier denied ever being in the 1100 block of West Lanvale Street,

but cell site location information establishes that Frazier's cell phone was pinging off a cell tower

in the area of the 1100 block of West Lanvale Street around the time Johnson was abducted.

### C. Frazier's Stash House at 961 Bennett Place

Although Frazier was living at 7002 Upper Mills Circle in Catonsville at the time of his

arrest, a wealth of evidence establishes that he was using a vacant residence at 961 Bennett Place

in Baltimore to conduct his drug trafficking operation.

For instance, in May 2016, Frazier directed an undercover officer posing as a drug user to

meet him in the 900 block of Bennett Place to purchase drugs.   ATF Task Force Officer

Christopher Faller testified at trial that he encountered Frazier while working in an undercover

capacity in the 2000 block of Forest Park Avenue on May 2, 2016.   TFO Faller asked Frazier much

it would cost to buy "an eight ball" of "girl"—coded language for an eighth of an ounce of crack

cocaine.   Frazier initially told TFO Faller that he would charge $250, but TFO Faller negotiated

the price down to $200.   In the coming days, Frazier and TFO Faller exchanged text messages

about meeting up to conduct the transaction, and Frazier directed TFO Faller to meet him at "945

Bennett place."[2] *See* Exhibit 2 (ATF Report #114), at 6.

In addition, ███ testified at trial that he purchased heroin from Frazier in the area of

Bennett Place on multiple occasions.   ███ testified that he would sometimes meet Frazier on a

particular block on Bennett Place, and, on at least one occasion, he saw Frazier go inside of a house

on the block and exit with heroin that he then sold ███.   ███ testified that he purchased heroin

from Frazier on four or five occasions, and he typically purchased between five and ten grams of

---

[2]      They did not ultimately carry out the transaction because Frazier became worried that his
potential customer was "police."   *Id.* at 3.

heroin from Frazier at a time.  During roughly this same period of time, an undercover officer

conducted a series of controlled purchases of heroin and fentanyl from ███.

Consistent with ███'s testimony, the cell phones discarded by Frazier on August 10, 2016

contained numerous text messages indicating that Frazier would meet drug customers in the area

of 961 Bennett Place to sell them drugs.  For instance, on July 6, 2016, a customer using phone

number (717) 387-0051 sent Frazier a text message asking whether Frazier could "spot" him "a

gram" of heroin for $50 if the customer provided the remaining $50 the following day.  *See* Exhibit

3 (Cell Phone Excerpts), at 9.  The customer asked whether he should go to "bennett or forest"

(*i.e.*, Bennett Place and Forest Park Avenue).  *See id.*  Later, the customer advised, "Yo im here

parked behind your caR bennett is closed."  *Id.* at 10.  After the transaction was completed, the

customer complained about the quality of the drugs, saying: "Dude that white shit was trash man

. . . got my girls nose bleedin."  *See id.*

On July 9, 2016, a drug customer using phone number (443) 850-8939 sent Frazier a text

message asking whether Frazier was "dwn bennett"—*i.e.*, on Bennett Place—and saying he

"need[ed]" Frazier.  *See id.* at 13.  Later, the customer told Frazier he was ready to come to Bennett

Place to get "2 pills" of heroin.  *See id.*  On July 14, 2016, the same customer sent Frazier text

messages indicating that he wanted to buy a specific quantity of heroin for a specific amount of

money.  *See id.* at 16.  Later, the customer advised that he was on Bennett Place and asked how

long it would take Frazier to get there.  *See id.* ("How long til u get dwn benn . . . Im right here

bro.").  On July 19, 2016, the same drug customer sent Frazier a text message saying he was ready

to "come holla" at Frazier and asking where Frazier was.  *See id.* at 20.  Frazier said he was "Down

ben"—*i.e.*, on Bennett Place.  *See id.* at 26.

-8-

On July 16, 2016, a drug customer using phone number (540) 836-7103 sent Frazier a text message asking, "You good?" *Id.* at 16. Frazier said "Yes" and asked, "What u need[?]" *See id.* at 23. The customer stated that he was going to pick up the "3 pills" of heroin that Frazier owed him and that he "want[ed] 2 more." *See id.* at 16. Later, the customer advised that he was "here on benett" and then clarified that he was "[i]n front of 1000 benett." *Id.* at 16. Frazier said, "Coming to u now." *See id.* at 23. The following day, the same customer asked Frazier whether he was "good for a 12 for 10." *Id.* at 18. Frazier said "Yes." *See id.* at 24. Later, the customer advised, "I'm here at 1000 Bennett." *Id.* at 18.

On July 24, 2016, Frazier directed another individual to meet him at "961 Bennett Place." *See* Exhibit 1, at 3. Frazier also used the email address "lilsid961@gmail.com." *Id.* at 1.

**D.  Search Warrant Executed at 961 Bennett Place on November 16, 2017**

Since his arrest on January 25, 2017, Frazier has been incarcerated at the Chesapeake Detention Facility in Baltimore, Maryland. Roughly ten months later, on November 16, 2017, members of the Baltimore Police Department searched the vacant dwelling at 961 Bennett Place in connection with an unrelated homicide investigation.

On November 15, 2017, at approximately 4:36 p.m., BPD Detective Sean Suiter was fatally shot in the rear yard of 961 Bennett Place. *See* Report to the Commissioner of the Police Department of Baltimore Concerning an Independent Review of the November 15, 2017 Incident and Its Aftermath, *available at* https://assets.documentcloud.org/documents/4793351/Suiter-Report-Public.pdf (last visited February 1, 2020), at 1.[3] He was pronounced dead at the University of Maryland Shock Trauma Center the following day. *Id.* at 53.

---

[3] The Report accurately describes the rear yard of 961 Bennett Place as the "vacant lot immediately west of 959 Bennett Place." *Id.* at 1, 11, 27. As shown in Figure 7, it is the grassy

-9-

In the immediate aftermath of the shooting, investigators did not know who had shot Detective Suiter or why. *See generally id.* at 1–39. At the time of the incident, Detective Suiter had been investigating a triple homicide in the Harlem Park neighborhood with BPD Detective David Bomenka. *Id.* at 19. According to Detective Bomenka, shortly before the shooting, Detective Suiter reported seeing a suspicious person in the area. *Id.* at 24. Detective Bomenka saw Detective Suiter run toward the vacant lot at 961 Bennett Place and begin to unholster his gun. *Id.* at 29–30. He heard Detective Suiter shout "Stop! Stop! Stop! Police!" and then heard several gunshots. *Id.* at 31. Detective Suiter's radio transmitted a brief unintelligible sound before going dead. *Id.* at 31–32. Detective Bomenka found Detective Suiter lying face down in the vacant lot, with his gun drawn and his radio in his left hand, suffering from a gunshot wound to the head. *Id.* at 31–37. Based on these facts and circumstances, investigators reasonably believed that there was an active shooter in the area. *Id.* at 36; *see also id.* at 1.

The following morning, November 16, 2017, at approximately 9:53 a.m.,[4] a BPD Swat Team made entry into the vacant building at 961 Bennett Place on an emergency basis in order to check for additional victims or suspects. The officers activated their body-worn cameras prior to entering the building. They made an orderly sweep of each room of the house, determined that there was no one inside, and exited the dwelling at approximately 10:00 a.m.

The body-worn camera footage depicts all the telltale signs of a vacant property. Photographs from the footage are attached as Exhibit 4. The grass in the rear yard is overgrown,

---

area immediately east of 961 Bennett Place (pictured on the right) and immediately west of 959 Bennett Place (pictured on the left). *See id.* at 30. It is enclosed by a fence that marks the outer boundary of 961 Bennett Place.

[4]    The time stamp from the body worn camera shows initial entry at approximately 14:53 Zulu time, which is equivalent to 9:53 a.m. in Eastern Standard Time. Exhibit 4, at 5.

and there is litter strewn about.  The windows are boarded up, and the numbers on the front door ("961") are faded almost beyond recognition.  There is a "No Trespassing" sign posted in the window to the right of the door.  In the window to the left of the door, there is a notice that appears to have the City of Baltimore insignia on it—possibly a Vacant Building Notice.  Many of the rooms inside do not have proper walls or even floors.  There do not appear to be working lights or plumbing.  Loose wires hang from some of the walls.  There is bulk refuse at the base of the stairs and in a back room.  There are no beds or futons or anything resembling an area where a person might sleep.  As the officers make their way through the building, they say things like, "If anybody steps in here, watch this hole," and, "Looks like there's no walls, it's under construction."

Although the house was unfit for human habitation, the officers observed evidence of illegal drug trafficking activity in plain view at the base of the stairs, including suspected drugs and drug paraphernalia, a box for a Taurus gun, and multiple rounds of ammunition.  The body-worn camera footage shows what looks like a spoon with white powder residue sitting on top of a package of insulation material.  One officer says, "Hey just a heads up, there's a pistol holster right here on the ground."  Another officer chimes in: "There's another one over here along the wall."  Later, an officer can be heard saying, "There's a bunch of packaging material here too."

Because the officers had observed contraband in plain view inside the residence, they applied for a warrant to search the residence for evidence relating to the shooting of Detective Suiter.  The search warrant was issued later that morning by the Honorable Devy Russell of the District Court of Maryland for Baltimore City.  *See* Exhibit 5 (Search Warrant).

BPD officers executed the warrant at approximately 11:40 a.m. on November 16, 2017.  Photographs from the execution of the search warrant are attached as Exhibit 6.  Among other

-11-

evidence, law enforcement officers recovered a Taurus gun box, a box of Magtech .25 caliber ammunition, additional .38 caliber ammunition, two gun holsters, a spoon with white powder residue, two sifters, plastic gloves, bags of empty vials and gelatin capsules of the type commonly used to package narcotics, razor blades with white powder residue, gelatin capsules containing white powder, and an expired ATM card in the name of "Sydni D. Frazier."  The ATM card was sitting on top of a mirror coated in white powder residue amidst all the other contraband.  *See id.* at 9.  The serial number on the Taurus gun box—TJN73204—matched the serial number on the Taurus 9mm caliber firearm recovered from Frazier's backpack and used to kill Ricardo Johnson. In the same area as the contraband at the base of the stairs, the photographs depict a Baltimore City Housing Department notice advising that a certificate of occupancy requires certain building inspections prior to issuance, and that "electrical, mechanical, plumbing and H.V.A.C.& R. permits" require certain building inspections.  *See id.* at 5.

**E.  Housing and Property Records for 961 Bennett Place**

Contrary to the Defendant's claims, neither Sydni Frazier nor anyone in his family owned or legally resided at 961 Bennett Place in 2016 or 2017.  In fact, the property was deemed "vacant" and "unfit for human habitation" by the Baltimore City Housing Department as of April 2013 at the latest.

Property and housing records show that on November 24, 1987, Gladys Williams and her husband Charles Williams acquired the title to 961 Bennett Place after having purchased it from the Director of Finance and Collector of State Taxes for the City of Baltimore.  *See* Exhibit 7 (1987 Deed for 961 Bennett Place).  On April 28, 1989, Gladys Williams and Charles Williams conveyed the property to Karim Enterprises, Inc., a Maryland Corporation registered to Charles Williams of

-12-

4637 York Road, Baltimore, MD 21212.  *See* Exhibit 8 (1989 Deed for 961 Bennett Place).  Not

long afterward, on October 11, 1989, Karim Enterprises, Inc. forfeited its corporate status.  *See*

Exhibit 9 (Karim Enterprises Corporate Status).

In the early 1990s, Charles Williams, who now went by "Karim Faruq," was arrested in

connection with a federal drug trafficking investigation.  In 1993, he was convicted of conspiracy

to distribute heroin, possession of a firearm by a felon, income tax evasion, and money laundering,

and sentenced to 385 months in prison.  *See United States v. Karim Faruq*, Criminal No. CCB-91-

0217.[5]  While incarcerated, he stopped paying property taxes for 961 Bennett Place.

On May 16, 2016, the Director of Finance and Collector of State Taxes for the City of

Baltimore sold 961 Bennett Place to MD Tax Properties 2016, LLC in tax foreclosure proceedings.

*See* Exhibit 10 (2018 Deed for 961 Bennett Place).  On August 24, 2016, MD Tax Properties 2016,

LLC filed a complaint against Faruq to foreclose rights of redemption, and a notice was posted to

the property the same day.  *See* Exhibit 11 (Certified Judgment Foreclosing Rights of Redemption),

at 4.  On December 19, 2017, the Circuit Court for Baltimore City issued a judgment decreeing

that the title to 961 Bennett Place had vested in MD Tax Properties 2016, LLC based on the

proceedings in *MD Tax Properties 2016, LLC vs. Charles Williams a/k/a Karim Faruq*.  *See id.* at

1.  On April 23, 2018, the Director of Finance and Collector of State Taxes for the City of

Baltimore conveyed 961 Bennett Place to MD Tax Properties 2016, LLC.  *See* Exhibit 10.

Meanwhile, in early April 2013, the Baltimore City Housing Department inspected 961

Bennett Place and determined that it was a vacant building.  *See* Exhibit 12 (Certified Housing

---

[5]    Faruq was granted a sentencing reduction on November 18, 2015, at which time his sentence was reduced to 349 months in the Bureau of Prisons.  He was released on May 3, 2017, and his supervised release was terminated on November 18, 2019.  *See* CCB-91-0217, ECF 357.

-13-

Department Documents), at 16–21.[6]  The Department issued a Code Violation Notice and Order Number 947040A concluding that 961 Bennett Place was "in violation of the Building, Fire and Related Codes of Baltimore City" and "unfit for human habitation."  *Id.* at 16.  Between 2013 and 2018, Department officials periodically inspected the property, took photographs, and ensured that the property was kept clean and clear.  *See id.* at 9–15, 21–41.  For instance, photographs from October 22, 2014 show the aforementioned code violation notice posted to the front door of the property.  *Id.* at 32–33.  On March 3, 2016, the Baltimore City Housing Department issued Citation Number 54288345 with respect to 961 Bennett Place for failure to register a Vacant Building Notice.  *See* Exhibit 13 (VBN Citation).  Photographs from December 2015, February 2017, March 2017, August 2017, and October of 2017 show that the property was boarded up and unoccupied. Exhibit 12, at 36–40.  Again on July 17, 2018, the City Council of Baltimore issued Code Violation Notice and Order Number 1697593A-1 concluding that 961 Bennett Place was "in violation of the Building, Fire and Related Codes of Baltimore City" and "unfit for human habitation."  *Id.* at 4.

The Baltimore City Housing Department still to this day lists 961 Bennett Place as a vacant building.  There are no records of the Department ever issuing a rental license for 961 Bennett Place.  *See* Exhibit 14 (Certified Records of Rental Licensing).  There are no records of Department issuing any work permits to conduct alterations between 2013 and 2019.  *See* Exhibit 15 (Baltimore Housing Work Permit Search).

---

[6]     Inspection records from April 1, 2013 state: "Property boarded throughout front, side and rear --- third floor windows open (no glass in panes) --- T/D in rear yard --- no BG&E service --- has water service though no usage --- property unoccupied."  *Id.* at 21.

**F.  Frazier's Prior Residences**

There is some evidence that Frazier lived at 961 Bennett Place with his mother in the mid-2000s.  When Frazier was arrested by members of BPD on September 15, 2005, at the age of 11, he provided 961 Bennett place as his address to the arresting officers.  In addition, in late 2006, Faruq filed a successful lawsuit against Frazier's mother, Lisa Bess, alleging that she was a tenant holding over at 961 Bennett Place.  *See* Exhibit 16 (Eviction Lawsuit).  Bess was evicted on February 27, 2007, when Frazier was 13 years old.  *See id.*

The government is not aware of any evidence that Frazier resided at 961 Bennett Place—legally or otherwise—since the eviction lawsuit.  Indeed, of the twenty-four times that Sydni Frazier has been arrested by members of BPD over the past roughly eight years, he has never provided 961 Bennett Place as his address to arresting officers.  He has provided the address 2923 Rosalyn Avenue (or some spelling variation thereof) eighteen times, the address 2123 Rosalyn Avenue (or some spelling variation thereof) two times; the address 2923 Rogers Avenue three times; and the address 4850 Clifton Avenue one time.  Most recently, on January 3, 2017, when BPD Homicide Detective Gary Niedermeier executed a search warrant for Frazier's DNA in connection with the instant case, Frazier provided his address as 2923 Rosalind Avenue, Baltimore, Maryland 21215.  As discussed above, at the time of his arrest by ATF on January 25, 2017, Frazier was living with his girlfriend at 7002 Upper Mills Circle in Catonsville.

**II.  ARGUMENT**

Fourth Amendment rights "may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in

the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant.  *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

To be legitimate, an expectation of privacy must be objectively reasonable and must flow from "a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *Carter*, 525 U.S. at 88; *see also United States v. Castellanos*, 716 F.3d 828, 831 (4th Cir. 2013) (defendant's Fourth Amendment claim failed because he did not demonstrate any "ownership or possessory interest" in the searched vehicle); *Grainger v. United States*, 158 F.2d 236, 238 (4th Cir. 1946) ("[O]ne who is not the owner, lessee, or lawful occupant of premises searched cannot raise the question whether there has been an unlawful search and seizure.") (citing 47 Am. Jur. 508).  By definition, a trespasser, or one who is unlawfully on another's property, does not have standing to contest a search of the property.  *See United States v. Jackson*, 585 F.2d 653, 658 (4th Cir. 1978) ("[A]n individual [who] places his effects upon premises where he has no legitimate expectation of privacy (for example, in an abandoned shack or as a trespasser upon another's property) . . . has no legitimate reasonable expectation that they will remain undisturbed upon these premises and consequently has no standing or right to contest a search."); *Chicco v. United States*, 284 F. 434, 436–37 (4th Cir. 1922) (bootlegger could not object to search of premises he "unlawfully and clandestinely occupied . . . as a cache for contraband liquor"); *United States v. Gale*, 136 F.3d 192, 195–96 (D.C. Cir. 1998) (defendant who changed the lock of apartment rented to another and used it for packaging drugs did not have a legitimate expectation of privacy in the apartment because he did not have legal authority to be there).

-16-

In some circumstances an overnight guest may have a legitimate expectation of privacy in his host's home.  *See Minnesota v. Olson*, 495 U.S. 91 (1990).  The rationale for such protection is that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society."  *See id.* at 98–99.  Examples of such functions include house-sitting for a friend, *see Jones v. United States*, 362 U.S. 257, 259 (1960), or providing care to the elderly, *see Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

On the other hand, a visitor who is "essentially present for a business transaction" does not have a legitimate expectation of privacy.  *Carter*, 525 U.S. at 90.  Thus, in *Carter*, the Supreme Court held that visitors who used a friend's apartment "simply [as] a place to do business"—specifically, to package cocaine—had no legitimate expectation of privacy.  *Id.*; *see also United States v. Gray*, 491 F.3d 138, 145 (4th Cir. 2007) (defendant present in residence of another for purpose of distributing drugs did not have reasonable expectation of privacy and therefore lacked standing to challenge unlawful search), *cert. denied*, 552 U.S. 1190 (2008); *United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003) (interpreting *Carter* to create "a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters"); *United States v. Gamez–Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) (interpreting *Carter* to hold that "[a]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location").

Here, Frazier claims that the owner—Faruq—gave him a key and permission to enter 961 Bennett Place, and that he was actively assisting with renovations on the property in the months leading up to his arrest.  ECF 1266, at 3.  Frazier further claims that despite his arrest in January

2017, he retained a reasonable expectation of privacy for the ensuing ten months, until the search of 961 Bennett Place in November 2017.  Frazier cannot meet his burden.

As a preliminary matter, it does not appear that Faruq was the owner or had legal authority to convey a possessory interest in the property to Frazier during this time period.  Although Faruq was still named on the deed, he had defaulted on his property taxes, and Baltimore City had sold 961 Bennett place to MD Tax Properties 2016, LLC in May 2016.  Maryland tax law indicates that in these circumstances, where the property is not owner-occupied, the possessory interest in the property immediately transfers to Baltimore City upon completion of the sale.  *See* Md. Tax-Property Code Ann. § 14-830(e) ("[E]xcept as to property actually occupied by the owner if a certificate of sale is held by the Mayor and City Council of Baltimore City …, then the Mayor and City Council of Baltimore City … has the right of immediate possession of the property represented by the certificate of sale …, without the necessity of receivership proceedings.").  Since Faruq unquestionably did not live in 961 Bennett Place at the time of the tax sale (he was incarcerated through May 2017), the possessory interest in the property transferred to Baltimore City on May 16, 2016.  *See* Exhibit 10.  After that date, Frazier was, at best, a trespasser, and one to whom the Fourth Amendment's protections do not extend.[7]  *See Jackson*, 585 F.2d at 658 (defendant who stashed evidence of an illegal gambling business "in an empty room in [a] vacant house in which he had concededly neither a proprietary nor a possessory interest . . . had no more

---

[7]       Even if Faruq retained a possessory interest in the property up until December 2017 when the judgment foreclosing rights of redemption was issued, *see* Exhibit 11, Baltimore City Housing Department records establish that he had *neither* a license to operate the property as a rental dwelling *nor* a work permit to renovate the property.  *See* Exhibits 14 & 15.  Therefore, he had no legal authority to allow Frazier to reside there or assist with renovations.  Because Frazier could not derive an interest in 961 Bennett Place from someone who had no legal authority to give it, he cannot claim Fourth Amendment protection in the vacant building.

-18-

expectation of privacy than if he had placed the bag in plain view in a public place"); *United States v. Simmons*, 43 Fed. App'x 614, 618–19 (4th Cir. 2002) (unpub.) (defendant lacked standing to contest the search of an apartment he claimed his girlfriend was renting for him, where the rental agreement was for a different apartment in the building, and the district court found that the defendant was "living there illegally"); *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (defendant lacked standing to challenge the warrantless search of a vacant house that he had stayed in for a week, but did not own or rent); *United States v. Dodds*, 946 F.2d 726 (10th Cir. 1991) (defendant did not have a legitimate expectation of privacy in an abandoned apartment where he said he sometimes slept, but as to which he had no ownership or possessory interest or lawful right to be there).

Even if Faruq *was* the rightful owner of 961 Bennett Place and *did* give Frazier lawful authority to enter, Frazier did not have an objectively reasonable expectation of privacy because he used the vacant dwelling exclusively for business purposes—to run his illegal drug trafficking operation—and not as an overnight guest.  The evidence conclusively establishes that Frazier was not staying at 961 Bennett Place at the time of his arrest in January 2017 or at the time of the search in November 2017.  Frazier admitted that he was living with his girlfriend in Catonsville at the time of his arrest, and his girlfriend and her mother confirmed it.  He remained incarcerated for nearly ten months until the property was searched in connection with an unrelated investigation. Moreover, the Baltimore City Housing Department had officially noticed 961 Bennett Place as a vacant property, and it bore all the telltale signs of a vacant property: boarded up windows, structural deficiencies, lack of electricity or plumbing, and the absence of furniture that could be used for sleeping.  There is no evidence Frazier kept any belongings at 961 Bennett Place aside

from the tools of his drug trafficking operation.  Although his ATM card was located in the residence, the manner in which it was found—amidst other drug paraphernalia, covered in drug residue—indicates that it was not being used for its intended purpose, but rather to cut drugs with its sharp edge.  The testimony of witnesses, the cell phone evidence, and the items ultimately recovered during the search, all demonstrate that Frazier used the vacant property for the sole purpose of stashing guns and drugs and conducting drug transactions.  In short, there was nothing tying Frazier to 961 Bennett Place other than his illegal drug trafficking operation.  Accordingly, he did not have a legitimate expectation of privacy there.  *See Carter*, 525 U.S. at 88–91; *Gray*, 491 F.3d at 145–46.[8]

The Fourth Circuit's decision in *Gray* is instructive.  In that case, the defendant was arrested in an associate's apartment after neighbors complained that certain individuals were running a drug ring out of the home.  *Gray*, 491 F.3d at 146–47.  Police found the defendant and others standing beside a table containing digital scales and cocaine base, and the defendant had $8,000 and additional cocaine base on his person.  *Id.*  During the arrest, a drug customer showed up to the residence looking to buy drugs.  *Id.* at 142.  The customer later testified that he had seen the defendant packaging cocaine base in the apartment on prior occasions.  *Id.*  Although it was undisputed that the defendant had the owner's permission to be there, the Fourth Circuit held that the defendant did not have a reasonable expectation of privacy in the apartment because he was using it for a commercial purpose—drug dealing—and was "a business, not a social guest."  *Id.* at 146–47.  Here, as in *Gray*, Frazier cannot challenge the search of 961 Bennett Place because he

---

[8]    Even if Frazier was assisting with (unpermitted) renovations at 961 Bennett Place—a claim unsupported by the evidence—he still would have no reasonable expectation of privacy in a property that he used for a quintessentially business purpose.  *See id.*

used the premises exclusively for the commercial purpose of dealing drugs.  Indeed, Frazier's

connection to 961 Bennett Place is even farther removed from the "social" side of the dividing line

because there was *no one* living on the premises: it was a vacant property whose owner had been

incarcerated for decades.

Finally, even if Frazier did have a reasonable expectation of privacy in 961 Bennett Place

prior to his arrest on January 25, 2017, it was extinguished by the time of the search on November

16, 2017.  When a person voluntarily abandons or disclaims interest in property, his subjective

expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress

evidence seized from it.  *See United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995); *see also*

*Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the

Government's appropriation of . . . abandoned property").  Here, Frazier left incriminating

evidence in a vacant house and failed to make any efforts to claim it for the nearly ten months that

elapsed between his arrest and the search.  As such, he abandoned any reasonable expectation of

privacy he once had.  *See Gray*, 491 F.3d at 146 ("Someone who hides illegal activity in a vacant

field or abandoned warehouse . . . takes his or her chances that law enforcement officials will

happen upon incriminating evidence."); *cf. United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir.

1997) (reasonable expectation of privacy in a hotel room ends "after [the] rental period has

terminated," even if the guest leaves property behind).

In *United States v. Stevenson*, 396 F.3d 538, 540–41 (4th Cir. 2005), police obtained

consent from the defendant's landlord to search the defendant's apartment just four days after his

arrest.  The Fourth Circuit held that the defendant no longer had any reasonable expectation of

privacy in the apartment because he had fallen behind in rent and, following his arrest, had written

-21-

a letter to his girlfriend referring to himself as the "former renter" and giving her permission to take possession of his personal property in the apartment.  *See id.* at 544–48.  As compared to *Stevenson*, Frazier had a far weaker connection to the searched property (he was a business visitor, rather than a renter), and a far longer period of time had elapsed since he last set foot on the premises (ten months as opposed to four days).  The government is not aware of any case holding that a onetime business visitor to another's home retains a reasonable expectation of privacy in the premises for months on end after ceasing to conduct business there.  Such a rule would stretch the Fourth Amendment beyond its breaking point.

For all of these reasons, Frazier cannot meet his burden of demonstrating a reasonable expectation of privacy in 961 Bennett Place at the time of the search.

## III.  CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny the Defendant's motion to suppress evidence seized from 961 Bennett Place.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:_____/s/_____
         Christina A. Hoffman
         Lauren E. Perry
         Christopher M. Rigali
         Assistant United States Attorneys
         36 South Charles Street, Fourth Floor
         Baltimore, Maryland 21201
         (410) 209-4800

-22-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Opposition to the Defendant's Motion to Suppress Evidence Seized from 961 Bennett Place was filed electronically with the Court using the CM/ECF system and served using the CM/ECF system via e-mail to all counsel of record.

_____/s/_____
Christina A. Hoffman
Assistant United States Attorney