**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **UNDER SEAL** |
| **v.** | * | |
| | * | **Criminal No.  CCB-16-0267** |
| **SYDNI FRAZIER,** | * | |
| | * | |
| **a/k/a Syd,** | * | |
| **a/k/a Junior Boss,** | * | |
| **a/k/a Perry,** | * | |
| | ******* | |
| **Defendant.** | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

In Summer 2016, the defendant, Sydni FRAZIER, hatched a plan to rob and kill a drug dealer named Ricardo Johnson in order to enrich himself and his drug trafficking organization.  He and his co-conspirators kidnapped Johnson from outside his house, forced him into a stolen van, blindfolded and hog-tied him, shot him more than 20 times, and attempted to set his body on fire. In the roughly five years since he was arrested in this case, FRAZIER has caused mayhem in the Chesapeake Detention Facility, racking up nearly a dozen infractions for serious offenses including smuggling drugs and cell phones into the jail, possessing a weapon, threatening to kill a guard, and setting fire to jail property.  He has shown absolutely no remorse for his offenses and no intention of stopping his criminal activity.  He continues to present a grave danger to the public.

On March 3, 2020, following a roughly two-week trial, a jury convicted FRAZIER of one count of conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846 (Count One); one count of possession of a firearm in furtherance of a drug trafficking crime, resulting in the murder of Ricardo Johnson, in violation of 18 U.S.C. § 924(j) (Count Two); one count of possession of firearms by a felon, in violation of 18 U.S.C. § 922(g) (Count Three); and

one count of possession with intent to distribute fentanyl and heroin, in violation of 21 U.S.C. § 841 (Count Four).

As discussed more fully below, the sentencing guidelines call for life imprisonment. But regardless what sentencing guidelines apply, a life sentence is the only sentence adequate to (1) reflect the seriousness of the offense, which involved drug trafficking, robbery, kidnapping, and an especially heinous murder; (2) afford adequate deterrence for criminal activity that has a devastating impact on the community; (3) protect the public from an extremely violent and dangerous defendant with a high likelihood of recidivism; and (4) avoid unwarranted disparities between the defendant and other defendants convicted of first-degree murder after trial. *See* 18 U.S.C. § 3553(a).

## I. RELEVANT FACTS

### A. Drug Trafficking Conspiracy

From at least prior to August 2014 through January 2017, Sydni FRAZIER was a member of a drug trafficking organization that operated in the 5200 block of Windsor Mill Road in Northwest Baltimore. He was also affiliated with a violent set of the Bloods gang known as Murdaland Mafia Piru, or MMP. FRAZIER and his co-conspirators referred to themselves as the "5200 Boys" or the "Get Money Boys." Their drug shop was close to Interstate-70, so it attracted customers driving from Western Maryland and other states. Text messages from FRAZIER's cell phones established that he sold multiple grams of heroin per day at this location, on a nearly daily basis, for a period of several years. Gov. Tr. Exs. CELL5a, CELL6a, CELL7a. FRAZIER and his co-conspirators agreed to distribute many hundreds of grams of heroin over the lifetime of the conspiracy.

One of FRAZIER's co-conspirators in the drug trafficking organization was Shakeen Davis, a/k/a "Creams."  Cell phones recovered from FRAZIER and Davis contained dozens of text messages in which they discussed drug trafficking—both with each other and with their customers.  Gov. Tr. Exs. CELL2a, CELL3a, CELL5a, CELL6a, CELL7a.  For instance, there were text messages in which customers asked for specific quantities of "boy" and "girl"—street terms for heroin and cocaine, respectively.  *Id.*  There were web searches for things like "**how to make heroin rock solid**."  Gov. Tr. Ex. CELL2a.  There were text messages in which FRAZIER and Davis advertised the potency of the heroin they had for sale, saying, "**Got fire**," or "**I got a bomb**."  Gov. Tr. Exs. CELL3a, CELL5a, CELL6a, CELL7a.  There were text messages from customers who warned that the heroin they bought from FRAZIER and Davis caused them serious bodily harm.  One customer reported, "**[E]nded up in the hospital but I'm better now, … I'll send people your way if they are looking**."  Gov. Tr. Ex. CELL2a.  Another customer advised, "**I'm in the hospital.  Whatever was in that stuff gave me a blood infection.**"  Gov. Tr. Ex. CELL7a.

There were also text messages establishing that FRAZIER was willing to use violence in order to enforce drug debts.  For instance, in a text message on August 4, 2016, FRAZIER told a drug customer that he knew where she lived and threatened to hurt her, saying: "**[Address redacted] and u have family [o]ut dundalk . . . when I see u u going wish u ain't never play wit me . . . I promise u and guarantee u imma run into u sooner than u think . . . imma make u feel this when I run into u**."  Gov. Tr. Ex. CELL5a.

FRAZIER also participated in a number of recorded jail calls with Davis in which they talked about their drug trafficking business.  For instance, in a call on August 2, 2014, FRAZIER told Davis that the cops pulled him over and found the hidden compartment in his car where he

3

stashed drugs, but he was going to "**beat that shit on a technicality**."  Gov. Tr. Ex. J1.  In a call on August 3, 2014, FRAZIER talked to Davis and another co-conspirator about pooling their money together get a better supply of heroin.  Gov. Tr. Ex. J2.  Frazier stressed that it was important to "**work together**" to make the business stronger.  In a call on August 4, 2014, Davis told FRAZIER that he was getting money together for FRAZIER's bail from other members of the conspiracy.  Gov. Tr. Ex. J3.  In a call on August 22, 2014, FRAZIER told Davis that he knew of a drug stash spot they could rob, saying "**all we need is the pieces" (*i.e.*, the guns)**, and proposing they "**go down there and dictate**."  Gov. Tr. Ex. J4.  In a call on August 28, 2014, Davis informed FRAZIER that he had put two "bitches" (*i.e.*, guns) in the woods and that he could not retrieve them because the "knockers" (*i.e.*, the police) were over there.  Gov. Tr. Ex. J5.  In a call on August 1, 2016, FRAZIER told his girlfriend that he had been arrested while trying to make a heroin sale, that he and Davis had run from the police together, and that Davis had gotten away despite having a gun tucked in his waistband.  Gov. Tr. Ex. J7.  In a call on January 26, 2017, FRAZIER told Davis to collect a $1,000 drug debt for him, and Davis agreed.  Gov. Tr. Ex. J9.

Although FRAZIER did most of his drug dealing in the 5200 block of Windsor Mill Road, he used a vacant house at 961 Bennett Place as a stash location to store, mix, and package drugs to prepare them for distribution.  Sometimes FRAZIER would direct customers to meet him there.  For instance, in May 2016, FRAZIER directed an undercover officer posing as a drug user to meet him in the 900 block of Bennett Place to purchase drugs.  Gov. Tr. Ex. CELL4.  A witness (hereinafter referred to as M.L.) testified at trial that he would sometimes meet FRAZIER outside 961 Bennett Place to purchase heroin.  M.L. testified that he purchased five- to ten-gram quantities of heroin from FRAZIER on multiple occasions in 2016.  Consistent with M.L.'s testimony,

photographs from one of FRAZIER's cell phones showed him posing outside 961 Bennett Place. Gov. Tr. Ex. CELL5a.

On November 16, 2017, members of the Baltimore Police Department ("BPD") searched FRAZIER's stash house at 961 Bennett Place in connection with an unrelated homicide investigation. Among other evidence, law enforcement officers recovered a Taurus gun box (discussed further below), a box of Magtech .25 caliber ammunition, additional .38 caliber ammunition, two gun holsters, over ten grams of heroin and fentanyl, sifters, bags of empty vials and gelatin capsules of the type commonly used to package narcotics, razor blades with white powder residue, and an expired ATM card in the name of "Sydni D. Frazier." FRAZIER's ATM card was sitting atop a mirror coated in white powder residue amidst all the other contraband. Gov. Tr. Ex. SW1–17.

### B. Murder of Ricardo Johnson

In the early morning hours of August 10, 2016, FRAZIER and one or more co-conspirators kidnapped and brutally murdered a neighborhood drug dealer named Ricardo Johnson, a/k/a "Uncle Rick." FRAZIER's primary purpose in kidnapping and murdering Johnson was to rob him of his drug stash and enrich himself and his drug trafficking organization.

At roughly 6:25 a.m. on August 10, Johnson's body was discovered in the backseat of a stolen van parked beside the light rail tracks in the 2200 block of Kloman Street in Baltimore. He was bound by his wrists and ankles and blindfolded. The medical examiner determined that Johnson sustained twenty-six gunshot wounds to the face, neck, torso, and buttocks. There was hemorrhaging associated with all twenty-six wounds, meaning that he was alive for all of them. There were also multiple lacerations and contusions to Johnson's forehead and nose, suggesting

that he had been struck with a blunt object.  Gov. Ex. AUT8.  Numerous 9mm caliber casings and projectiles were recovered from in and around the van.  There was partially burned paper material sticking out of the gas tank of the van, indicating that FRAZIER and his co-conspirators had attempted to set Johnson's body on fire before departing the scene.

The investigation revealed that Johnson had been abducted outside his residence at 1101 West Lanvale Street at roughly 2:30 a.m. that morning while he was on the phone with his girlfriend.  Johnson's girlfriend heard what sounded like a scuffle and impassioned voices, and then the phone abruptly hung up.  She immediately called 911 and ran to the scene, but neither she nor police could locate Johnson.

At roughly 5:17 p.m. on August 10, less than twelve hours after Johnson's body had been found, members of the BPD Dirt Bike Task Force were in the area of 2100 Tucker Lane when they observed an unknown black male—later identified as FRAZIER—riding a dirt bike.  Because the use of dirt bikes is illegal in Baltimore City, the officers attempted to stop FRAZIER and confiscate the bike.  FRAZIER fled on foot and, in the process, abandoned the dirt bike as well as a backpack and gloves he had been wearing.  FRAZIER was able to evade arrest, but the officers obtained video footage of FRAZIER on the dirt bike from nearby surveillance cameras.  Gov. Tr. Exs. SF1, SF2, SF3, SF4.  FRAZIER was wearing shorts and a white t-shirt in the footage.  *Id.*

The backpack FRAZIER abandoned was found to contain a jacket, two cell phones, and two loaded 9mm caliber handguns—a Smith & Wesson 9mm caliber semi-automatic handgun with serial number HAE0456, and a Taurus 9mm caliber semi-automatic handgun with serial number TJN73204.  Both guns were a ballistic match to the 9mm caliber casings recovered from the murder scene.  In addition, the BPD DNA and Serology laboratory determined that FRAZIER's

6

DNA profile matched DNA from the *insides* of the gloves, and the *victim's* DNA profile matched DNA from the *outsides* of the gloves.  FRAZIER's DNA was also found on the jacket inside the backpack.

The two cell phones found in the backpack were chock full of text messages discussing drug trafficking.  Gov. Tr. Exs. CELL5a, CELL6a.  They also contained additional evidence linking FRAZIER to the murder.  For instance, five days before the murder, on August 5, 2016, FRAZIER received text messages from phone number (410) 831-5525 instructing him to "**Get a box of rubber gloves**" because "**We don't want to touch nuffn.**"  Gov. Tr. Ex. CELL5a. FRAZIER confirmed that he would, saying, "**that's a mandatory.**"  *Id.*  Also on August 5, 2016, FRAZIER sent Shakeen Davis, a/k/a "Creams," a text message saying, "**Grab three black Jimmy macs.**"  *Id.*  The government presented evidence that the term "jimmy mac" is commonly used to refer to a firearm.  On August 9, the day before the murder, FRAZIER got a text message asking "**Wassup with that lick bro.**"  *Id.*  The government presented evidence that "lick" is a street term for a robbery.  On August 10, 2016, at 11:18 a.m.—roughly *five hours* after Johnson's body was discovered—the same (410) 831-5525 phone number sent FRAZIER another text message attaching a screenshot of a news article about the murder, titled, "**Search for witnesses after man found fatally shot in back of minivan by light rail station**."  *Id.*  At the time of the text message, police had not yet identified the victim as Ricardo Johnson.

An FBI expert analyzed cell site location data for FRAZIER's phones recovered from the backpack.  The data showed that in the early morning hours of August 10, FRAZIER's phones were hitting off towers in the area of 1101 W. Lanvale Street where the victim was abducted. Then, at a little after 6:00 a.m., FRAZIER's phones were hitting off towers down in South

Baltimore, a short distance from where Ricardo Johnson was killed—an area that FRAZIER was not known to frequent.  Gov. Tr. Ex. CSLI1.

Witness testimony at trial established that FRAZIER murdered Ricardo Johnson in furtherance of his drug trafficking organization.  M.L. testified that the victim, Johnson, was known to be a heroin supplier and to have a lot of money.  In the days leading up to the murder, M.L. heard FRAZIER tell other members of his drug trafficking organization, including Shakeen Davis, a/k/a "Creams," about his plans to kidnap Johnson and rob him of his drug stash.  In the days following the murder, M.L. heard FRAZIER admit to killing Johnson, and he also observed FRAZIER with an unusually large quantity of heroin, which FRAZIER shared with other members of his drug trafficking organization.

On January 25, 2017, in connection with the Ricardo Johnson murder investigation, members of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") arrested FRAZIER outside his girlfriend's house at 7002 Upper Mills Circle in Catonsville, Maryland.  In a search of FRAZIER's person, ATF agents recovered a clear plastic bag containing a mixture of heroin and fentanyl weighing approximately five grams, as well as three cell phones—one of which was full of text messages about drug trafficking.  Gov. Tr. Ex. CELL7a.

After his arrest, FRAZIER was brought to the ATF building in Baltimore, where he signed a *Miranda* waiver form and agreed to take part in a videotaped interview.  During the interview, FRAZIER made a series of demonstrably false statements.  For instance, when asked about the dirt bike chase on August 10, 2016, FRAZIER claimed that the person on the bike was not him, and that he never rode dirt bikes or wore gloves.  However, publicly accessible Facebook and Instagram photographs showed FRAZIER sitting atop dirt bikes, while wearing gloves.  Gov. Tr.

8

Exs. IG13, IG14, IG47.  In addition, when shown a photograph of the victim, FRAZIER denied

knowing him.  However, the victim's cell phone reflected dozens of contacts with FRAZIER, some

as recent as June 2016.   Gov. Tr. Ex. CELL1a.

In a recorded jail call on January 29, 2017, four days after his arrest, FRAZIER instructed

his girlfriend to get rid of the white t-shirt and shorts he was wearing during the dirt bike chase on

August 10, 2016.  Gov. Tr. Ex. J11.  FRAZIER asked his girlfriend, **"Whatchu do with the**

**outfit?"**  He then directed her to **"[p]ut that mother fucker in the recycle bin."**  His girlfriend

asked, **"You had on a regular white tee, right?"**  Frazier said **"Yeah,"** and added, **"I liked them**

**shorts, too."**  Gov. Tr. Ex. J11.

As mentioned above, BPD officers searched FRAZIER's stash house at 961 Bennett Place

in November 2017 and recovered his ATM card, along with drugs, drug paraphernalia,

ammunition, and a Taurus gun box.  The serial number on the Taurus gun box—TJN73204—

matched the serial number on the Taurus 9mm caliber firearm recovered from FRAZIER's

backpack and used to kill Ricardo Johnson.

### C.  MMP Affiliation and Other Evidence

At FRAZIER's original trial in March 2019, the government presented evidence that

FRAZIER was closely affiliated with the Bloods gang Murdaland Mafia Piru (MMP).  Although

FRAZIER did not jump through the hoops for formal membership in the gang, witnesses testified

that he worked in concert with MMP members to sell drugs in the 5200 block of Windsor Mill

Road and essentially functioned as a member of the gang.  As discussed above, he was particularly

close with Shakeen Davis, a/k/a "Creams," who was a proud member of MMP.  In one jail call

between them, Davis greeted FRAZIER with the MMP catchphrase, "What's mobbing?"  A

photograph from FRAZIER's Instagram account showed FRAZIER posing in front of graffiti at the BP gas station that read "5200," "MM" (for Murdaland Mafia), and "Pull up at your own risk." Gov. Tr. Ex. SM 20, at 10.  In a post to his Twitter account—"jrbo$$"—FRAZIER said: **"I do it 4 da hood whole MOB riding wit me."**  Gov. Tr. Ex. SM20, at 69.  (The "Mob" was another name for MMP.)  Numerous photographs showed FRAZIER posing with other members of the gang, some of whom were making MMP gang signs.  *See generally* Gov. Tr. Exs. SM15, SM20.

 

*Frazier posing in front of the MMP graffiti at the BP gas station (left) and with Shakeen Davis (right)*

A witness (hereinafter, "J.G.") testified that in Summer 2015, the leader of MMP, Dante Bailey, "fronted" about an ounce of cocaine to FRAZIER to sell, but Bailey got locked up before FRAZIER could pay him back.  The government played jail calls in which Bailey talked with others about trying to collect the drug debt from "Syd."  Gov. Tr. Exs. J-58, J-59, J-60.

Another witness (hereinafter, "W.B.") testified that Dante Bailey "greenlit" or approved Ricardo Johnson's murder because he was rumored to be cooperating with law enforcement.  The

government introduced evidence that FRAZIER had a death wish for anyone who "snitched."  For instance, on January 11, 2017, FRAZIER posted the following image to his Instagram account:



*See* Gov. Tr. Ex. SM15, at 9.  He added the comment, "Kill yaself or Tell on yaself Choose."  *Id.* at 10.  The government also introduced a video recording recovered from FRAZIER's cell phone, dated July 27, 2016, that captured FRAZIER talking to a group of friends about what should happen to "rats."  Gov. Tr. Ex. CELL5b; *see also* Exhibit 1 (Transcript of Cell Phone Recording, July 27, 2016).  The conversation began with an unknown male lamenting that the brother of Baltimore rapper Young Moose had been killed.  FRAZIER replied that Young Moose's brother had "told," *i.e.*, cooperated with law enforcement.  He added: **"A rat not supposed to live, yo.  If my brother a rat, and I gotta kill him, yo, I might have to do that."**  *Id.*

Although it is clear that FRAZIER's predominant motivation in killing Ricardo Johnson was to rob him, it is likely that the rumor Johnson was a "snitch" played a role as well.  At the very least, FRAZIER probably believed he could not leave Johnson alive after robbing him, since

11

Johnson might report the crime to law enforcement.  But he likely also hoped to increase his standing with Dante Bailey and MMP by eliminating a potential witness against the gang.

### D.  Victim Impact

Ricardo Johnson was 47 years old when he was killed.  He was the beloved son of Toni Burton, father of Ricardo Eric Johnson, Jr., and grandfather of Camden Johnson.  His family members describe him as a good and caring person who "would do anything for the people he loved."

 

*Johnson as a young man with his son, Ricardo Jr. (left) and mother, Toni Burton (right)*

Johnson did make mistakes in life.  He spent time in prison in young adulthood, which prevented him from being the father he wanted to be to Ricardo Jr.  After he was released, Johnson tried to make up for lost time by being there as much as he could for his grandson, Camden. Camden was three years old when Johnson was killed, but they had already forged a strong bond.

12

After Johnson's death, Camden would look at pictures of Johnson around the house and say, "Pop-Pop is in heaven."

 

*Johnson with his grandson, Camden*

Johnson's mother, Ms. Burton, was utterly devastated by the loss of her only child.  It is hard for her to come to terms with the fact that she will never again be able to look in his eyes or hold his hand.  The brutal way in which he was killed has left deep scars.  She was not able to bring herself to go back to the apartment where Johnson was living when he was abducted, so she had to rely on friends to collect his belongings and sell the home.  She reports that the image of her son being shot more than twenty times "sticks in [her] mind" and is something she "lives with every day."  She does not understand how anyone could treat another living creature—even a dog—the way her son was treated in the final hours of his life.

13

Ms. Burton has had a string of serious health challenges since Johnson's death. She first was diagnosed with cancer, and then, more recently, with atrial fibrillation, which landed her in the hospital for two and a half weeks. The doctor told her that her heart condition is stress-related; she believes it is connected to the trauma of losing her son. She does not have her son to take care of her while she is sick.

Ms. Burton is a remarkable woman. Her faith has given her strength and grace amidst enormous suffering. She visits Johnson's grave "every holiday," and she says she knows "he's looking down on me, waiting for me to come home." She is not a vengeful person. She prays for FRAZIER and his family. And she prays that the Court will impose a sentence that ensures no one else will ever have to endure the pain she has endured.

### E.  Post-Offense Criminal Activity While in Jail

FRAZIER's criminal activity has continued unabated throughout his pretrial detention and since being convicted. Since he came into federal custody in January 2017, FRAZIER has racked up at least ten jailhouse infractions for offenses including smuggling drugs, destroying jail property, refusing orders, threatening a correctional officer with violence, and—most recently, in March 2022—possessing a weapon. FRAZIER's continued lawlessness, despite a federal murder charge hanging over his head, shows that the only reliable way to protect the public from further crimes by him is to sentence him to life imprisonment.

To begin with, the evidence shows that both before and after his federal convictions, FRAZIER has been running a drug trafficking business within the walls of the Chesapeake Detention Facility ("CDF"). On February 17, 2019, for example, CDF officials confronted a woman ("S.D.") who arrived for a visit with FRAZIER. In FRAZIER's jail calls and written

correspondence with S.D. prior to this planned visit, FRAZIER requested that S.D. smuggle contraband into the facility. Ex. 2, at 12–15 (DPSCS After Action Report, Feb. 19, 2019). When CDF officials confronted S.D. about their belief that she was smuggling contraband into the facility, S.D. turned over 54 strips of 8mg Suboxone and 8 grams of suspected marijuana that she had concealed on her person for delivery to FRAZIER. *Id.* at 12. Later that year, in August 2019, FRAZIER attempted to burn a hole through the plexiglass in a visitor's booth—a hole which presumably could be used to pass contraband between a visitor and an inmate. Ex. 2, at 22 (DPSCS Notice of Inmate Rule Violation, Aug. 25, 2019). CDF officials noticed the smell and damage immediately after FRAZIER had occupied that booth for a visit with a female visitor. *Id.* And just one month after this incident, in September 2019, a search of FRAZIER's cell yielded four Suboxone strips and a pair of designer sunglasses. Ex. 2, at 25 (DPSCS Notice of Inmate Rule Violation, Sept. 11, 2019).

As noted above, FRAZIER's drug smuggling activities continued *even after* he was convicted by a jury in this case. During an October 21, 2020 jail call, a female associate told FRAZIER that she had seen on the news that three correctional officers at CDF were indicted for smuggling drugs and cell phones into the facility. Ex. 3 (audio of Oct. 21, 2022 jail call). FRAZIER's conversation with the female suggested that he was familiar with the officers' smuggling activities. *See id.* Subsequently, an unknown male got on the phone, and FRAZIER asked him where "Sticky" was. FRAZIER went on to say that "Sticky" was supposed to have 175 "strips" (*i.e.*, Suboxone strips) for him, and that people had been giving FRAZIER money as advance payment for the drugs. *Id.* The unknown male asked whether FRAZIER wanted him to get the "strips" from "Sticky," and FRAZIER said yes. *Id.* FRAZIER then added (twice) that he

15

needed to know "if they gone, . . . so I can know I gotta buy more." *Id.*  FRAZIER also added, **"I got business to take care of"**—referring to his drug trafficking business in the jail.  *Id.*

FRAZIER's post-sentencing criminal conduct has not been limited to smuggling and dealing drugs, however.  Disciplinary records show that FRAZIER also possessed a contraband cell phone in the jail, Ex. 2, at 28 (DPSCS Notice of Inmate Rule Violation, Oct. 14, 2020), and on numerous occasions he refused officers' orders to get back into his cell or assigned unit or caused damage to jail property.  Ex. 2, at 1–10, 19 (DPSCS Notices of Inmate Rule Violation, Oct. 4, 2018; Oct. 10, 2018; Dec. 07, 2018; Feb. 20, 2019; Aug. 14, 2019).

The most disturbing aspects of FRAZIER's disciplinary record are indications that he is ready and willing to commit further violence.  For instance, in August 2019, after refusing an officer's order to get back onto his assigned unit, FRAZIER threatened the guard, saying:  **"I should beat you the fuck up out here.  I don't care about no camera.  I can take you in a cell where no one will see."**  Ex. 2, at 19 (DPSCS Notice of Inmate Rule Violation, Aug. 14, 2019). There is good reason to believe this was not empty rhetoric.  Just recently, on March 9, 2022, CDF officials discovered a seven-inch homemade knife stashed under FRAZIER's mattress.  FRAZIER acknowledged that the knife was his.  Ex. 2, at 31 (Offender Case Mgmt. System screenshot, Mar. 9, 2022).

## II.  ARGUMENT

### A.  <u>Standard of Proof at Sentencing</u>

Unlike a jury's verdict, which must be based on proof beyond a reasonable doubt, the standard of proof for findings of fact at sentencing is a simple preponderance of the evidence.  *See, e.g.*, *United States v. Grubbs*, 585 F.3d 793, 798–803 (4th Cir. 2009); U.S.S.G. § 6A1.3, Cmt.

("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").  Furthermore, a sentencing court may consider uncharged (or even acquitted) conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence.  *See Rita v. United States*, 551 U.S. 338, 352 (2007) (noting that "many individual [Sentencing] Guidelines apply higher sentences in the presence of special facts," and "[i]n many cases, the sentencing judge, not the jury, will determine the existence of those facts"); *see also United States v. Watts*, 519 U.S. 148, 154 (1997); *Witte v. United States*, 515 U.S. 389, 399–401 (1995); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361 (1984); *Grubbs*, 585 F.3d at 798–800.

### B. Advisory Sentencing Guidelines Calculation

#### 1. Count One—Drug Trafficking Conspiracy

With respect to Count One, the base offense level is 24 pursuant to U.S.S.G. § 2D1.1(c)(8) because FRAZIER conspired to distribute more than 100 grams of heroin.[1]

There is a two-level increase in the offense level pursuant to U.S.S.G. § 2D1.1(b)(2) because FRAZIER possessed firearms in connection with the drug trafficking conspiracy. Contrary to the Defendant's claim, this enhancement does not result in double-counting. FRAZIER possessed *not only* the two 9mm caliber firearms he discarded when fleeing from the police on August 10, 2016, but others as well—as evidenced by his jail calls (*i.e.*, the references to "bitches" and "pieces" described above), his text messages (*i.e.*, "Grab three black jimmy

---

[1]     During FRAZIER's first trial in March to April 2019, the government proved that members of the conspiracy distributed more than a kilogram of heroin, but the jury in this case did not find that quantity attributable to FRAZIER beyond a reasonable doubt.

macs"), and the .25 and .38 caliber ammunition recovered from Frazier's stash house on November 16, 2017.

There is also a two-level increase in the offense level pursuant to U.S.S.G § 2D1.1(b)(4) because the defendant made a credible threat to use violence—specifically, the threat to use violence against a drug customer on August 4, 2016.

The adjusted offense level is 28.

### 2. Count Two—Possession of a Firearm in Furtherance of a Drug Trafficking Conspiracy, Resulting in Death

With respect to Count Two, the base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the defendant killed Ricardo Johnson, and the killing was murder in the first degree.

The government seeks a two-level upward adjustment under U.S.S.G. § 5K2.8 because "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." The evidence at trial established that FRAZIER and his co-conspirators abducted the victim as he was entering his apartment at approximately 2:30 a.m. They stuffed him in the backseat of a stolen van, where they bound him by the wrists and ankles and blindfolded him. They drove him around Baltimore for several hours, presumably interrogating him about the location of his drug stash. Johnson sustained several large lacerations and contusions to his face, suggesting that the killers pistol-whipped him. Eventually they shot him over twenty times in the face, neck, torso, and buttocks. He was alive for each of the twenty-six gunshot wounds. Crime scene and cell site evidence indicate that they did not kill Johnson until close to 6:00 a.m. Thus, there was a period of several hours in which they subjected him to prolonged pain and humiliation and gratuitous infliction of injury.

There is also a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because, after FRAZIER was arrested and questioned by the police, he directed his girlfriend to destroy the clothing he wore on the day of the Ricardo Johnson murder. *See* App. Note. 4(D) (providing, as an example of covered conduct, "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding").

The adjusted offense level is 47.

Pursuant to *United States v. Bran*, 776 F.3d 276 (4th Cir. 2015), the sentence on Count Two must run consecutively to any other term of imprisonment. *See* 18 U.S.C. § 924(c); U.S.S.G. § 2K2.4, App. Note 2(A).

### 3.   Count Three—Possession of Firearms by a Felon

With respect to Count Three, the base offense level is 20 pursuant to U.S.S.G. § 2K2.1(a)(6) because the defendant committed the offense subsequent to sustaining a felony conviction for a controlled substance offense—namely, a 2015 conviction for possession with intent to distribute controlled substances in the Circuit Court of Maryland for Baltimore City (Case Number 114233017).

There is a two-level increase in the offense level pursuant to U.S.S.G. § 2K2.1(b)(4)(A) because one of the firearms was stolen. Specifically, the Smith & Wesson firearm with serial number HAE0466 was reported stolen out of Charlestown, Virginia on August 25, 2014.

Again, there is a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because FRAZIER directed his girlfriend to destroy the clothing he wore on August 10, 2016, when he fled from police and discarded the firearms.

The adjusted offense level is 24.

### 4. Count Four—Possession with Intent to Distribute Fentanyl/Heroin

With respect to Count Four, the base offense level is 14 pursuant to U.S.S.G. § 2D1.1(c)(13) because the offense involved at least 4 but less than 8 grams of fentanyl. At trial, BPD Forensic Chemist Emanuel Obot determined that the drugs recovered from FRAZIER's person at the time of his arrest on January 25, 2017 consisted of a heroin-fentanyl mixture with a net weight of approximately 4.93 grams.

### 5. Total Offense Level

There has been no acceptance of responsibility, so U.S.S.G. § 3E1.1 does not apply. Counts One and Four "group" pursuant to U.S.S.G. § 3D1.4. The drug trafficking and felon-in-possession groups do not increase the offense level because they are all nine or more levels less serious than the highest offense level of 47 for Count Two. Therefore, the total offense level is **47**.

### 6. Criminal History

FRAZIER is in Criminal History Category III with five criminal history points. His criminal convictions include (1) a 2012 conviction for CDS Possession-Marijuana; (2) a 2013 conviction for Burglary-Fourth Degree; and (3) a 2015 conviction for CDS Possess with Intent to Distribute-Narcotics. He was on probation for the burglary conviction at the time of the instant offense—namely, the drug trafficking conspiracy charged in Count One, which spanned from at least August 2014 through January 2017.

### 7. Advisory Guidelines Range

The total offense level for Counts One, Two, Three, and Four is **47**, resulting in a guideline sentence of **life imprisonment**. *See* U.S.S.G. §§ 3D1.2, 3D1.3, 3D1.4, 5G1.1.

The applicable guideline range for the Count One (28/III) is 97 to 121 months.   The applicable guideline for Count Two (47/III) is life, to run consecutively to any other term of imprisonment.   The applicable guideline range for Count Three (24/III) is 63 to 78 months.   The applicable guideline range for Count Four (14/III) is 21 to 27 months.

### III.   Analysis of Factors Under 18 U.S.C. § 3553

It is hard to imagine more serious conduct, a more dangerous defendant, and a more compelling need for protecting the public and promoting respect for the law.

#### A.  Nature and Circumstances of the Offense

Most people agree that murder is the most serious crime there is.   But there are several aggravating factors that make this murder particularly egregious.   First, there was substantial planning and premeditation.   M.L. testified that he heard FRAZIER discussing the plot ahead of time with other members of his drug trafficking organization.    And the physical evidence introduced at trial established that the crime was meticulously planned.   FRAZIER and his co-conspirators obtained a stolen car so that it would be harder to trace back to them.   They used gloves to mask their fingerprints and zip-ties to prevent the victim's escape.    They stalked the victim to his residence on Lanvale Street and lay in wait for him.   They brought the victim to a desolate area, distant from where FRAZIER typically hung out.

Second, the victim did nothing to provoke the attack.   Although Johnson dealt drugs, there is no evidence that he ever mistreated FRAZIER or posed a threat to him in any way.   This murder was not the product of gang rivalry, as are so many of Baltimore's homicides.   FRAZIER targeted Johnson for the simple reason that he wanted Johnson's drugs and his money—and likely also because he wanted to eliminate Johnson as a potential witness.

Third, as discussed above, the manner in which the murder was executed was exceptionally cruel. Johnson was subjected to prolonged pain and humiliation and gratuitous infliction of injury. As his mother said during a meeting with the prosecution, not even a dog should be treated the way her son was treated in the final hours of his life. The images of his bound and bullet-perforated body will haunt her forever. As the defense acknowledged, a person must be "sufficiently depraved" to bind and beat a man, drive him around for hours as he undoubtedly begs for his life, and then shoot him 26 times. *See* ECF 1757, at 6.

The Court should reject outright the defense's claim that FRAZIER did not participate in the murder and was merely the "'youngin' who was supposed to dispose of the evidence." ECF 1757, at 12 n.3. The jury did not find FRAZIER guilty of being an accessory after the fact. The jury found FRAZIER guilty of murder. The evidence presented at trial established beyond a reasonable doubt that FRAZIER was the mastermind of the plot, as well as one of the shooters. M.L. testified that it was *FRAZIER* who hatched the plan to kidnap and rob Johnson. It was *FRAZIER* who turned up with an unusually large bag of heroin after the murder and bragged that he "got" Johnson. That is *direct* evidence—not circumstantial. But the circumstantial evidence is also compelling. FRAZIER's cell phone was pinging in the area where Johnson was abducted at the time of the abduction *and* in the area of the murder around the time of the murder. Twelve hours later, FRAZIER was caught not only with the two murder weapons, but with a pair of gloves with the *victim's DNA* on the outside—conclusive evidence that FRAZIER participated in the abduction. We also know that one of the murder weapons was FRAZIER's own gun, because a gun box with the matching serial number was found in his house, with his ATM card. There should not be a shred of doubt that FRAZIER himself planned and executed this murder.

22

## B.  History and Characteristics of the Defendant

FRAZIER's history and characteristics are that of a violent recidivist.  Although FRAZIER was in his early 20s at the time of his arrest in this case, he already had two felony convictions for burglary[2] and possession with intent to distribute controlled substances.  ECF 1498, at 13.  He was on probation in his burglary case at the time of the instant offense.  *Id.* at 14.  And he had been arrested *fifteen* other times as an adult for serious offenses including unlawful possession of handguns (twice), possession with intent to distribute narcotics (three times), burglary, car theft, assault, and disarming a law enforcement officer.  *Id.* at 14–16.

The defense argues that FRAZIER could not be a "cold-blooded killer" because his prior convictions were for non-violent offenses.  *See* ECF 1757, at 6.  But that ignores all the other evidence of FRAZIER's violent nature.  There was the August 2014 jail call in which FRAZIER told Davis about a drug stash spot they could rob and proposed that they get guns and "go down there and dictate."  Gov. Tr. Ex. J4.  There was the July 2016 recorded conversation in which FRAZIER told his friends he would kill his own brother if he "ratted" to police.  Gov. Tr. Ex. CELL5b.  There was the August 2016 text message in which FRAZIER threatened to hurt a drug customer who was behind on a debt, and menacingly warned that he knew where she and her family lived.  Gov. Tr. Ex. CELL5a.  After his arrest in this case, there was the August 2019 incident when FRAZIER threatened a correctional officer.  More recently still, there was the seven-inch knife found tucked under his mattress in March 2022. *See* Ex. 2.  All this evidence reveals

---

[2]     Although Fourth-Degree Burglary is categorized as a misdemeanor under Maryland law, it is punishable by up to three years in prison and is therefore a felony under federal law.

that the murder of Ricardo Johnson was not an aberration or anomaly—it was part of a long, consistent pattern of violent behavior.

### C.  Need to Protect the Public

Perhaps most importantly, there is an urgent need to protect the public from future violent crimes by FRAZIER.  FRAZIER's criminal conduct spanned years on the street and culminated in a heinous murder.  Moreover, his pretrial detention disciplinary records show that he is a chronic offender who has no respect for the law, a fact that has not changed since his March 2020 conviction.  He has showed absolutely no remorse for his offenses and no intention of stopping his criminal activity.  FRAZIER has been, and continues to be, a grave danger to those around him, and the only true way to protect the public from further violent crimes by him is to sentence him to life behind bars.

The Court should reject the defense's argument that FRAZIER's risk of recidivism will decline dramatically with age.  *See* ECF 1757, at 10.  The studies cited by the defense are out-of-date and incomplete.  In November 2021, the United States Sentencing Commission published new findings from its largest recidivism study to date, which encompassed over 32,000 offenders released in 2010, with an 8-year recidivism study period.[3]  The report examined 5,659 firearm offenders and found that they recidivated at a higher rate than all other offenders—***69%*** compared to 45% for all other offenders.  *Id.* at 6.  In other words, ***more than two out of three federal firearm offenders reoffended.***  For firearm offenders who were rearrested, the median time to arrest was just ***16 months***.  *Id.* at 23-24.  Moreover, ***40.5%*** of those who reoffended did so with a violent

---

[3]     *See* U.S. Sentencing Commission, Recidivism of Federal Firearms Offenders Released In 2010, November 2021, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20220209_Recidivism-Firearms.pdf (last visited May 17, 2022).

offense such as *homicide, rape, robbery, or assault*.  *Id.* at 26–27.  And firearms offenders recidivated at a higher rate than all other offenders at every age-at-release grouping.  Among those released *at age 60 or older, the rate of recidivism was still 31.1%*.  *Id.* at 29.

These figures show that there is no age at which a violent and dangerous person magically stops being violent and dangerous.  Although a 31.1% chance of recidivism at age 60 is too high to tolerate, FRAZIER's risk of recidivism is likely far higher still based on the unique facts and circumstances of his crime and his unique history and characteristics.  FRAZIER is not your average firearms offender.  He possessed the firearms in furtherance of a grisly murder.  And he has broken the law again and again while in pretrial custody.  Only a life sentence will ensure that no other family has to endure the pain and suffering that Ricardo Johnson's family has endured.

### D.  Need to Avoid Unwarranted Sentencing Disparities

Finally, a sentence less than life would create unwarranted disparities between FRAZIER and other similarly situated defendants.  Undersigned counsel conducted an informal survey of AUSAs in the Office, and we are not aware of any case in this district in which an adult defendant convicted of first-degree murder after trial has received a sentence of less than life.[4]  In recent years, dozens of defendants have been sentenced to life in prison for murder—many for murders less heinous than this one.  *See, e.g.*, *United States v. Mark Bazemore*, JKB-14-0479 (life on two

---

[4]     It is certainly possible that there are some such cases, but they have not been brought to our attention.  The only four cases we are aware of in which a defendant convicted of murder at trial has been sentenced to a term of years less than life involved either a *juvenile* defendant, or a defendant convicted of *second*-degree murder.  *See United States v. Portillo Rodriguez*, JKB-16-0259 (50 years for juvenile who committed murders when he was 15 years old); *United States v. Matthew Hightower*, MJG-15-322 (380 months for second-degree murder); *United States v. Roberto DeLeon*, RDB-09-0095 (22 years for second-degree murder); *United States v. Nancy Seigel*, AMD-03-0393 (400 months for second-degree murder).

counts, RICO conspiracy involving murder as a predicate racketeering activity, and drug trafficking conspiracy); *United States v. Trevon Beasley*, GLR-17-0223 (same); *United States v. Montana Barronette*, CCB-16-0597 (same); *United States v. Terrell Sivells*, CCB-16-0597 (same); *United States v. John Harrison*, CCB-16-0597 (same);[5] *United States v. Kenneth Jones*, JKB-16-0363 (same); *United States v. Marquis McCants* (same); *United States v. Gerald Johnson*, JKB-16-0363 (life on three counts, RICO conspiracy involving murder as a predicate racketeering activity, drug trafficking conspiracy, and VICAR murder); *United States v. Dante Bailey*, CCB-16-0267 (same); *United States v. Keon Moses*, CCB-02-0410 (life on four counts, drug trafficking conspiracy, and three § 924(c) and (j) counts); *United States v. Michael Taylor*, CCB-02-0410 (life on two counts, drug trafficking conspiracy and § 924(j)); *United States v. Aaron Foster*, CCB-02-0410 (life on one count of drug trafficking conspiracy involving murders); *United States v. Junior Noe Alvarado-Requeno*, PX-17-0382 (life on two counts, RICO conspiracy involving murder as a predicate racketeering activity, and VICAR murder); *United States v. Miguel Angel Corea-Diaz*, PX-17-0382 (same); *United States v. Raul Ernesto Landaverde-Giron*, PJM-15-0258 (same); *United States v. Jorge Enrique Moreno-Aguilar*, RWT-13-0496 (same); *United States v. Juan Alberto Ortiz-Orellana*, RWT-13-0496 (same); *United States v. Minor Perez-Chach*, RWT-13-0496 (same); *United States v. Miguel Angel Manjivar*, RWT-13-0496 (same); *United States v. Eric Antonio Mejia-Ramos*, RTW-13-0496 (life on one count of RICO conspiracy involving murder as a predicate racketeering activity); *United States v. Davon Carter*, GH-17-0667 (life on four counts,

---

[5]     In the Montana Barronette case, three defendants who were found guilty of *conspiring* to commit murder in furtherance of the RICO conspiracy were sentenced to terms of years less than life.  *See United States v. Dennis Pulley*, CCB-16-0597 (35 years); *United States v. Timothy Floyd*, CCB-16-0597 (30 years); *United States v. Linton Broughton*, CCB-16-0597 (30 years).  However, it is undersigned counsel's understanding that the Court determined that these defendants did not themselves commit any murders.

witness tampering resulting in murder, conspiracy to do the same, witness retaliation resulting in murder, and conspiracy to do the same); *United States v. Clifton Mosley*, GH-17-0667 (same); *United States v. Jose Morales*, DKC-13-4955 (life on one count of murder-for-hire); *United States v. Troy Lucas*, DKC-18-4069 (life on two counts, murder-for-hire and conspiracy to do the same); *United States v. Willie Mitchell*, AMD-04-0029 (life on nine counts, RICO conspiracy, drug trafficking conspiracy, and various VICAR and § 924(c) and (j) counts); *United States v. Oscar Armando Sorto-Romero*, JKB-16-0259 (life on four counts, RICO conspiracy, racketeering, and two VICAR murders); *United States v. Milton Portillo Rodriguez*, JKB-16-0259 (life on five counts, RICO conspiracy, racketeering, and three VICAR murders); *United States v. Maliek Kearney*, GLR-16-0486 (life on one count of interstate domestic violence resulting in death); *United States v. Chinua Shepperson*, AW-09-0598 (life on three counts, RICO conspiracy, VICAR murder, and § 924(j)); *United States v. Anthony Fleming*, WDQ-08-0086 (life on two drug counts with murder cross-reference at sentencing); *United States v. Leeander Blake*, WMN-06-0394 (life on two counts, carjacking and § 924(j)); *United States v. Hilton Thomas*, WMN-97-0355 (life on two counts, drug trafficking conspiracy and VICAR murder); *United States v. Warren Hill*, WMN-96-0458 (same).[6]

These cases reflect a broad consensus among judges in this district that the very most serious of crimes warrants the very most serious of prison sentences.  There is no reason to deviate from this long line of cases here, in a case involving serious aggravating factors.

---

[6]     The Anthony Fleming, Leeander Blake, Hilton Thomas, and Warren Hill sentences were recently reduced via compassionate release to 27, 30, 35, and 30 years, respectively, but only after decades of good conduct in prison reflecting extraordinary post-sentencing rehabilitation.  These reductions do not counsel in favor of imposing a lighter sentence for FRAZIER, whose conduct while in pretrial detention so far has been abysmal.

The cases suggested by the defense for comparison are simply not comparable.  *See* ECF 1757, at 11 & Ex. 1.  Co-defendants Shakeen Davis, Jamal Lockley, and Randy Banks were not convicted of murder.   Co-defendant Dontray Johnson did admit to committing a murder in furtherance of the RICO conspiracy, but there are several distinguishing factors between his case and FRAZIER's: (a) Johnson pled guilty prior to trial and accepted responsibility for his crimes, (b) he committed the murder on Dante Bailey's orders, and (c) the murder involved a single shot to the chest following a physical altercation and did not involve the same aggravating factors. Finally, the national average sentence for federal murders is not a useful data point.  That dataset presumably includes cases in which the defendant was convicted of second-degree murder, cases in which the defendant was a juvenile at the time of the murder, cases in which the defendant pled guilty and accepted responsibility, and cases in which the defendant cooperated with the government and assisted in the prosecution of others.  The defense has not pointed to a single case similar to this one in which a defendant has been sentenced to less than life.

## IV.    CONCLUSION

Based on the nature of the crime and the defendant's history and characteristics, the Court should harbor no illusion that a message of specific deterrence has any hope of reaching him. Instead, the Court should focus on the other goals of sentencing—reflecting the seriousness of the offense, protecting the public from the defendant, and deterring similar crimes by others.  Only a sentence of life will protect the public from future violent crimes by this defendant.  Only a sentence of life will send the message that this level of brutal, senseless violence will be met with the most serious of sanctions.  Only a life sentence will ensure that no other family has to endure the pain and suffering that Ricardo Johnson's family has endured.

Respectfully submitted,

28

Erek L. Barron
United States Attorney

By:  _____/s/_____
Christina A. Hoffman
Christopher M. Rigali
Assistant United States Attorneys
36 S. Charles St., Fourth Floor
Baltimore, Maryland 21201

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 18, 2022, a copy of the foregoing Government's

Sentencing Memorandum was served electronically to the Clerk of the United States District Court

using CM/ECF, and sent via e-mail to:

Christopher Davis,
Counsel for the Defendant

_____/s/_____
Christina A. Hoffman